## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RYDER J. NICHOLAS,

        Plaintiff,

v.                                                 No. CIV 04-546 JH/LFG

METROPOLITAN LIFE INSURANCE
COMPANY, METLIFE DISABILITY,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITIONS[1] ON CROSS MOTIONS FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR STATUTORY DAMAGES

### Introduction

THIS MATTER is before the Court on Defendant MetLife Disability's ("MetLife") Motion for Judgment on the ERISA Record [Doc. No. 35], *pro se* Plaintiff Ryder J. Nicholas' ("Nicholas") Motion for Summary Judgment [Doc. No. 41] ("cross motions for summary judgment"), and Nicholas' Motion for Statutory Damages [Doc. No. 43].[2]  The motions are fully briefed[3] and ready

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2]On April 12, 2005, the Honorable District Court Judge Judith Herrera referred these three motions, in accordance with 28 U.S.C. 636(b)(1)(B), to the undersigned Magistrate Judge for a recommended disposition. [Doc. No. 49.]

[3]Nicholas did not file a reply in support of his motion for statutory damages.  The deadline for having filed a reply has passed.  Thus, this motion also is fully briefed.

for resolution without the need for a hearing.  After careful consideration of the pertinent law, pleadings and attachments, the Court recommends that:  Defendant's motion for judgment on the ERISA record be granted, Plaintiff's motion for summary judgment be denied, Plaintiff's motion for statutory damages be denied, and that the case be dismissed, with prejudice.  The Court's analysis follows.

## Procedural Background

On April 20, 2004, Nicholas filed his initial complaint in State District Court.  [Doc. No. 1, complaint attached.]  The essence of that complaint was Nicholas' allegation that Defendant terminated his disability benefits in violation of his employer's short term disability plan.  He requested damages in the amount of $10,000.  On May 17, 2004, MetLife removed the lawsuit on grounds of federal question jurisdiction because Nicholas' claim(s) arose under the Employee Retirement Income Security Act of 1974 ("ERISA"),[4] 29 U.S.C. § 1001, *et seq.*  [Doc. No. 1.]

Nicholas was authorized to file a first amended complaint so as to assert his claims under ERISA.  His First Amended Complaint, filed on September 15, 2004, added a claim for additional damages in the amount of $4,003.22 plus interest for unpaid short term disability ("STD") benefits for the period of December 19, 2002 through January 23, 2003.  [No. 22.]  Nicholas claims that

---

[4]Nicholas admits that his claims implicate an ERISA plan.  However, he asks in his motion for summary judgment that regardless of how the court rules, he still be permitted to pursue some or all of the "separate" claims in state court.  The Court disagrees that the claims stated in the original state court complaint are separate from Nicholas' claims regarding the ERISA plan at issue here.  *See, e.g.,* Aetna Health Inc. v. Davila, 542 U.S. 200, 124 S.Ct. 2488, 2496 (2004) (if an individual, at some point in time, could have brought his claim under ERISA, and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely preempted by ERISA).  *See also* Caldwell v. Western Atlas Intern., 871 F. Supp. 1392, 1395 (D. Kan. 1994) ("ERISA provisions 'supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered under the statute.  ERISA preemption is 'deliberately expansive,' and the statutory phrase 'relate to' is  given a 'broad common-sense meaning.'") (internal citations omitted).  Here, the Court cannot speculate as to what claims Nicholas might be able to assert that are separate or that fall within ERISA's savings clause.  Thus, the Court makes no determination as to what causes of action, if any, for which Nicholas might be able to state a claim that do not implicate ERISA.

2

MetLife was acting under a conflict of interest, violated provisions of ERISA, the ERISA benefit plan, and internal policy, and provided inadequate notice to Nicholas of the claim denial, review and extension of time for review. [Doc. No. 22.]

## **Factual Background**

At all pertinent times, Honeywell International, Inc. ("Honeywell") employed Nicholas as a draftsman/designer. Nicholas claims he was unable to work and under a physical disability from August 23, 2002 through January 23, 2003. (He returned to work on January 27, 2003, Monday) [Doc. No. 41, pp. 2, 3, 6, 27.] Honeywell sponsored a STD Plan ("the Plan") which is an employee group welfare benefit plan that provides participants certain benefits and is governed by ERISA. MetLife administered claims for the Plan and is identified as the "Claims Administrator." [Doc. No. 27, Parties' Stipulations; Doc. No. 1, Ex. D; Affidavit of Laura Sullivan at ¶¶ 3, 6, attached as Ex. C to removal pleadings.] Honeywell is identified as the "Plan Administrator." [Doc. No. 1, Ex. D, p. 4.]

Under the Plan, Nicholas received STD benefits from August 23, 2002 until MetLife terminated the benefits, effective December 19, 2002. This case involves Nicholas' claim that he should have been paid disability benefits from December 19, 2002 through January 23, 2003, when he returned to work. Those benefits, according to Nicholas, amount to $4,003.22 plus interest.

## **Applicable Standard of Review**

Title 29 U.S.C. 1132(a)(1)(B) authorizes civil actions by participants in a benefit plan to recover benefits under a plan, to enforce the terms of a plan, and to clarify rights to future benefits under a plan. Nicholas has repeatedly requested that the Court apply a *de novo* standard of review in examining the denial of his benefits. "[A] denial of benefits challenged under 29 U.S.C. §

1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," in which case the administrator's denial will be upheld unless the decision is found to be "arbitrary and capricious." Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109, 115 (1989).  This rule derives from trust principles, which "make a deferential standard of review appropriate when a trustee exercises discretionary powers." Id. at 111.

Tenth Circuit decisions are in accord with the principle that if a plan grants an administrator discretion in determining eligibility for benefits, the court will review a challenge to the denial of benefits under an "arbitrary and capricious" standard.  Pitman v. Blue Cross and Blue Shield of Oklahoma, 217 F.3d 1291, 1295 (10th Cir. 2000).  However, it is not always entirely clear what evidence can be reviewed in ERISA cases under the two different standards.  "[D]e novo" ordinarily means that the court's review is not limited by the record, nor is any deference given the conclusion under review; rather, the court is to pursue the inquiry necessary to exercise its independent judgment" Reynolds v. UNUM Life Ins. Co. of America, 1998 WL 654475 at *3, No. Civ. A. 97-D-2325 (D. Colo. June 15, 1998).  A "de novo" review could include an analysis of facts ***not*** available to the plan administrator when the decision to deny benefits was made.  Id.

In contrast, under the "arbitrary and capricious" standard of review, the reviewing court "generally may consider only the arguments and evidence before the administrator at the time it made that decision." Chambers v. Family Health Plan Corporation, 100 F.3d 818, 823 (10th Cir. 1996) (internal citation omitted).  In other words, under an arbitrary and capricious standard, the reviewing court may consider only the evidence and facts considered by the administrators themselves when they made the benefits determination.  Id.  Thus, the reviewing court considers only the plan and

4

claim's file.   Other evidence or testimony is not submitted.   ERISA cases are decided on the administrative record and the arguments and authorities submitted by counsel.  Id. at 823-24.

In cases applying the arbitrary and capricious standard, less deference will be given to the administrator's decision when that administrator operated under a "conflict of interest."  Id. at 825. In a conflict of interest scenario, the administrator's decision "will be entitled to some deference, but his deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict."  Id. at 826 (citing Pitman, 24 F.3d at 123.)  Courts have characterized this approach as a "sliding scale of judicial review."  Id.  The conflict of interest will be a factor to consider when analyzing whether the administrator's decision was reasonable or arbitrary, but it does not necessarily entitle a party to discovery regarding the conflict of interest or to present evidence not considered by the administrator.  See id. at 824, 827 (rejecting the plaintiff's argument that "exceptional circumstances" would allow the court to review evidence not before the administrator based on the holding that arbitrary and capricious review applied).  Compare Reynolds, 1998 WL 654475 at *3, 4 (de novo standard of review applied and therefore, some discovery concerning the administrator's decision was permitted.)

In order to defeat the de novo presumption, the defendant bears the burden of identifying language in the plan that confers discretionary authority on the plan administrator, thereby warranting an arbitrary and capricious review.  Davis v. Sandia Corporation, et al., No. CIV 98-472 JC/JHG, slip op., Doc.18, (D.N.M. Feb. 8, 1999) (citing Firestone Tire, 489 U.S. at 115; Balderrama v. Life Insurance Company of North America, No. CIV 99-1167 LCS, slip op., Doc. 25 (D.N.M. June 5, 2000) (relying on Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000)).

Here, MetLife attached a copy of the Plan to the pleadings it submitted with the Notice of

Removal.  [Doc. No. 1.]  Article 4 of the Plan states:

> The determination of whether an Eligible Employee has a Disability
> shall be made in the sole discretion of the Plan Administrator, or in the
> sole discretion of the Claims Administrator if the Plan Administrator
> has delegated its power to make such determination to the Claims
> Administrator . . . .

[Doc. No. 1, Ex. D, ¶ 4.1.]  Article 7 of the Plan sets out the duties of the Claims Administrator.

> In addition to those responsibilities provided elsewhere in the Plan, the
> Plan Administrator has delegated to the Claims Administrator the
> following discretionary authorities and responsibilities:
>
> (a)  To process the acceptance or denial of an initial claim for benefits
> under the Plan;
>
> (b) To perform the review of benefits claims that have been denied in
> accordance with  Section 7.4;
> . . .
>
> (f)  To determine the amount of benefits which shall be payable to an
> Eligible Employee in accordance with the provisions of the Plan and
> to authorize payment of such benefits in connection with the claims
> review process.

The Plan clearly delegates to the Claims Administrator, the authority and discretion to review and

decide applications for benefits.   There is no question that MetLife is Honeywell's Claims

Administrator.[5]  [Sullivan Aff. at ¶ 6.]  Thus, based on the express language of the Plan, an arbitrary

and capricious standard of review applies.

Nonetheless, giving Plaintiff *pro se* the benefit of the doubt, and in view of his allegation that

a conflict of interest existed, the Court permitted Nicholas to engage in limited discovery on the issue

---

[5]The Court rejects Nicholas' argument that Sullivan did not provide evidence that MetLife is its Claims
Administrator.  Sullivan's affidavit states both that MetLife administers claims and in paragraph 6, she clearly
testifies that "[i]n its role as Claim Administrator under the Honeywell STD Plan, MetLife made a decision to
terminate Mr. Nicholas's STD benefits . . . ."  [Sullivan Aff. at ¶ 6.]

of an alleged conflict of interest and established a reasonable but specific amount of time within which

to complete discovery.  In accordance with the Court's ruling, Nicholas served interrogatories on

MetLife.  However, he served the discovery requests too late under the explicit deadlines set by the

Court.  Thus, when MetLife objected based on untimeliness, the Court ruled that MetLife's objections

were well-taken and concluded that Nicholas was unsuccessful in supporting his claim of the

existence of an alleged conflict of interest and/or that a *de novo* standard of review should be applied.[6]

Therefore, the Court concludes the arbitrary and capricious standard of review is applicable.

The "pure" arbitrary and capricious standard requires the court to uphold the administrator's decision

if it is grounded on any reasonable basis.  Nance v. Sun Life Assur. Co. of Canada, 294 F.3d 1263,

1269 (10th Cir. 2002).  That basis "need not be the only logical one nor even the best one."  Id.

(internal citation omitted).  Under that standard, the administrator's decision is entitled to deference.

## I.      CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.      Legal Standard

Summary judgment is not a "disfavored procedural shortcut."  Rather, it is an important

procedure designed to "secure the just, speedy and inexpensive determination of every action."

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).   Summary judgment is appropriate when the

moving party can demonstrate that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress

& Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins.

---

[6]The Court observes that the only piece of evidence that MetLife did not have before it in deciding
Nicholas' claim and appeal, that Nicholas apparently seeks the Court to consider, is a letter from his neurosurgeon,
written September 16, 2003 for purposes of litigation.  In other words, the doctor's letter was written about ten
months after Nicholas had his back surgery was solicited by the attorney Nicholas at one time retained.  [Doc. No.
41, MCL 041, 042.]  Even if the Court were to consider this September 16, 2003 letter, it would not change the
outcome of the Court's review and decision.

Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The party moving for summary judgment has the initial

burden of establishing, through admissible evidence in the form of depositions, answers to

interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence

to support the opposing party's case and the moving party is entitled to judgment as a matter of law.

Celotex Corp., 477 U.S. at 325.

The factual record along with any reasonable inferences that may be drawn therefrom must

be examined in the light most favorable to the party opposing summary judgment.  Spaulding v.

United Transp. Union, 279 F.3d 901, 904 (10th Cir.), *cert. denied*, 537 U.S. 816 (2002).  Once the

moving party meets its burden, the party opposing the motion must come forward with specific facts,

supported by admissible evidence, which demonstrate the presence of a genuine issue for trial.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v.

Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).  The party opposing the motion

may not rest upon the mere denials of his pleadings to avoid summary judgment.  Fed. R. Civ. P.

56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  Rather, the

nonmoving party must "set forth specific facts that would be admissible in evidence in the event of

trial from which a rational trier of fact could find for the nonmovant."  Mitchell v. City of Moore,

Okla., 218 F.3d 1190, 1197-98 (10th Cir. 2000) (internal citation omitted).

Here, where the parties have filed cross motions for summary judgment, "[the court is]

entitled to assume that no evidence needs to be considered other than that filed by the parties, but

summary judgment is nevertheless inappropriate if disputes remain as to material facts."  James

Barlow Family Ltd. Partnership v. David M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997),

*cert. denied*, 523 U.S. 1048 (1988).  In this regard, each party as the nonmovant is given "wide berth

to prove a factual controversy exists." <u>Jeffries v. Kansas</u>, 147 F.3d 1220, 1228 (10th Cir. 1998) (internal citation omitted).  Therefore, the legal standard remains the same – each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.  <u>Atlantic Richfield Co. v. Farm Credit Bank</u>, 226 F.3d 1138, 1148 (10th Cir. 2000).

  **B.**  <u>**Undisputed Facts**</u>

  These facts are primarily taken from the medical records and physician notes that are attached as exhibits to pleadings and marked with page numbers "MCL __."

  In 2002, Nicholas was 37 years old.  He reported that he suffered an injury to his lower back in November 2000, resulting in a herniation of the discs of the L4-L5 and L5-S1 vertebrae.  Although Nicholas claims to have been bedridden for one week due to the injury, he continued to work after that week, with pain and numbness.  As of August 19, 2002, Nicholas had tried conservative therapies, including physical therapy, chiropractic care, and three epidural steroid injections, but he continued to "deteriorate with increasing pain."  The August 2002 neurosurgery record notes that Nicholas was "forced to take more time off of work because of his pain."  [MCL 90.]  Nicholas' imaging study in July 2002 showed "rather dramatic degenerative disc disease and a large L4-5 disc herniation."  [MCL 92.] Surgery and a fusion procedure were options to be considered.

  On August 20, 2002, Nicholas signed an Attending Physician Statement to release his medical records to MetLife.  It appears that the Statement was faxed to MetLife on September 3, 2002.  [MCL 104-05.]  Dr. Rice's diagnosis on the form was sciatica.  No limitations were marked on the form.  [MCL 105.]  Nicholas' last day of work during this time frame was August 23, 2002 (Friday).

  Based on later submissions of medical information to MetLife, Nicholas' application for STD benefits were granted, effective August 26, 2002.  The benefits initially were granted for the dates

of August 26, 2002 through September 15, 2002. [MCL 14-15.] Nicholas was informed by letter from MetLife that if his disability extended beyond September 15, he was required to have his health care provider submit to MetLife specific medical information, including two of the most recent: office visits; diagnostic test results; operative reports and discharge summaries, if any; rehabilitation or therapy notes, if any; names and dosages of medications; functional abilities and expected return to work date. [Id.] The letter informed Nicholas that if MetLife did not receive any such information by October 18, 2002, his claim would be closed, effective September 15, 2002.

On August 29, 2002, Nicholas met with neurosurgeon Mark Erasmus, M.D., who discussed a number of possible treatments for Nicholas. Nicholas was to consider his treatment options as of this date. [MCL 93.] An October 23, 2002 physical therapy record states that Nicholas was being treated from 9/4/02 until 10/23/02 and had been there six times. Nicholas reported that his maximum sitting tolerance was 30 minutes. [MCL 102.] An Attending Physician Supplementary Statement, filled out and signed by Dr. Gorvetzian on October 25, states that Nicholas' subjective complaint was lumbar disc displacement. Nicholas was to undergo a microdiscectomy that was not yet scheduled. Dr. Gorvetzian noted that Nicholas could not sit or stand for extended periods. [MCL 101.]

Nicholas was given physical therapy on October 28 and 30, 2002. He rated his pain 7 of 10. [MCL 88.] Nicholas was swimming as part of his therapy then. On November 1, 2002, Nicholas did

not attend therapy due to illness.[7]   A November 5, 2002 medical record indicates that Nicholas

decided on a left L4-5 discectomy, and surgery was scheduled.  [MCL 82, 83, 84, 94.]  On November

7, he reported to the physical therapist that he would undergo surgery and was ceasing therapy as of

this date.  [MCL 87.]  Nicholas reported that overall, he was doing worse than when his last progress

summary was performed on October 23.   However, the therapy record indicated Nicholas had met

most of his treatment goals.  [MCL 86.]

On November 22, 2002, Nicholas underwent an L4-5 laminectomy discectomy.  [MCL 76.]

On December 3, 2002, Nicholas presented to the nurse at the neurosurgery office for a routine

surgical site check of the procedure.  The post-op record states that Nicholas was able to ambulate

independently and his gate was steady, but that he was unable to determine if he was improved from

the preoperative state.  [MCL 73.]  He still had left leg pain.  At that time, Nicholas was not using

narcotic pain medication but was still taking Ibuprofen (he took Ibuprofen for pain before the surgery

---

[7]Nicholas complains about MetLife's handling of his claim as of this same date, November 1, 2002.  For example, he protests that MetLife already had the records that Nicholas had to retrieve himself on October 25, 2002 to fax to MetLife, and he implies that MetLife is simply inept for not locating records it already possessed. Based on the numerous, clear diary entries by MetLife, Nicholas complaints are without basis.  On October 21, 2002, MetLife informed Nicholas that it did not have the necessary medical information to consider extending his disability.  On October 24, 2002, Nicholas learned that while he had given the forms to his doctor, the rehabilitation department had failed to fill them out and send them to MetLife.  On November 1, 2002 at 2:49 p.m. Nicholas told MetLife that he had faxed the form to MetLife on October 25, 2002.  However, MetLife responded that the records were not in the system.  Nicholas said he would fax them again and that he wanted a call back to confirm receipt.  At 3:37 p.m., MetLife called back Nicholas and left a message for him to call them.  At 3:54 p.m. on Nov. 1, MetLife talked to Nicholas who was upset about the processing of his claim and his physical pain.  He said he could not sleep and was on pain medications constantly.  The MetLife employee told Nicholas that when the medical records were received, he or she would review them and call him.  At 4:19 p.m., MetLife received the Attending Physician Statement signed by Dr. Gorvetzian on October 25, but faxed to MetLife on Nov. 1.  Three minutes after receipt of the statement, MetLife approved Nicholas STD benefits through October 1, but the MetLife representative indicated in the diary notes that MetLife needed more detailed medical records to extend again.  At 4:33 p.m., MetLife called Nicholas and advised him of the extension and informed him of the need for more detailed records. [MCL 27.]  The MetLife diary is replete with communications to Nicholas about the processing of his application.

as well).  Per Dr. Erasmus, Nicholas was informed that he could resume swimming.  He was scheduled to follow up with Dr. Erasmus in 2 to 3 weeks.  [MCL 73.]

Although there may have been some confusion at times, perhaps on both ends,[8] Nicholas' STD benefits were extended over a number of weeks, finally through December 19, 2002.  [MCL 16, 18, 20,  22.]  The last letter from MetLife to Nicholas provides essentially the same information, i.e., that if he extended his disability beyond December 19, 2002, additional *recent* medical information had to be submitted to MetLife by December 26, 2002.  If none was received by that date, Nicholas' claim would be closed, effective December 19th.  [MCL 23.]  His claim was closed as of December 19, 2002, even though Nicholas did not report back to work until January 23, 2003.

On December 23, 2002, Dr. Erasmus saw Nicholas.  The medical record indicates Nicholas' subjective complaint was occasional left leg pain.  "He feels that it is different from before.  It comes and goes."  Dr. Erasmus encouraged him to increase his activity and to make another appointment in two months.  Nicholas was to avoid heavy lifting and bending.  [MCL 71.]

On January 15, 2003, MetLife sent Nicholas a letter concluding that it was unable to extend benefits beyond December 19.  [MCL 60.]  MetLife had reviewed the office notes, dated December 3 and December 23, and summarized those results in the letter, along with definitions of "total

---

[8]Nicholas makes much of the fact that a voice message was left by MetLife for him on October 14, 2002, informing him that his application for STD benefits was approved, and that shortly thereafter he received a letter, dated October 18, 2002, informing him that his claim was closed effective September 15.  However, this only indicated that MetLife initially approved STD benefits for Nicholas for August 26, 2002 through September 15, 2002.  Because no supporting medical records were submitted by October 18, 2002, i.e., recent treatment records *after* 9/15/02, his disability  the claim was not extended past 9/15/02 and was initially closed as of that date.  This is clear from the MetLife diary of contacts about this claim. *See, e.g.,*MCL 26 ("EE [employee] called about status of claim [on 10/21/02].  Told EE we had not received any medical info from AP [attending physician].  EE stated he had sent form to AP and would get in touch with AP to have it sent in.  EE is still on DIS and cannot return to work."  As of 10/24/02, the diary indicates that "EE called and stated that his AP had sent the forms to send in over to the Rehab Dept and then he found out that they never filled  them out and sent them in.  EE will go there today and have them fill the form out and fax it in.")

disability" from the Plan language.  MetLife confirmed with Honeywell that Nicholas' job was a sedentary position with no lifting or bending.  Thus, MetLife concluded that the medical information did not support a condition that precluded Nicholas from performing his job beyond December 19. Nicholas was informed of his right to appeal the decision.

Nicholas checked back with Dr. Erasmus in one month, on January 23, 2003.  The medical record indicates that Nicholas was "doing very well.  He started his yoga.  That probably has helped him a lot.  He is still having some problems with his left arm."  Dr. Erasmus then observed that "it should be known that as a draftsman where he has to sit in one place with his neck fixed for a long period of time, I would not expect that after the surgery he could return to that type of activity for at least six weeks after the surgery.  That would include sitting for an extended period of time." [MCL 67.]  As of this date, January 23, 2003, a little more than five weeks had passed since Nicholas had surgery.  He returned to work on January 27, 2003 (Monday), which he describes as being exactly six weeks from his surgery.

On February 3, 2003, Nicholas sent a letter to MetLife stating that he would appeal MetLife's denial of benefits.  Nicholas further explained that while the doctor's notes of December 3 and 23, 2002 did not include limits on work, he had not discussed work with Dr. Erasmus on those occasions because Dr. Erasmus "had already instructed me that I would under no circumstances be able to return to work for a minimum 6-8 weeks after surgery.  I have included notes from my most recent doctor's visit on 1/23/03." [MCL 65.]  The problem with Nicholas' argument is that when MetLife denied benefits in the January 15 letter, it had no recent information from Dr. Erasmus as to the expected date for Nicholas' return to work, i.e., it did not have the January 23 medical record.

13

Moreover, even the January 23 doctor's note, submitted by Nicholas on February 3, does not say "6-8" weeks.  It says "at least 6 weeks."

MetLife received Nicholas' appeal in early February 2003.  [MCL 35, 64-68.]  On March 17, 2003, MetLife wrote to Nicholas stating that it was continuing its review of his appeal and that it needed an additional 45 days to render a decision.  [MCL 59.]  Nicholas strongly complains that MetLife did not timely provide him with notice of the need for extension, that it violated the Plan provisions by failing to notify him of the special circumstances that justified an extension, and that MetLife cannot unilaterally grant itself an extension.

On April 29, 2003, MetLife wrote to Nicholas informing him that the original denial of benefits beyond December 19, 2002 was upheld.  [MCL 50.]  In its denial of Nicholas' appeal, MetLife detailed the pertinent medical records, including the January 23 doctor's record, and the Plan provisions.  Specifically, the letter noted that there was no evidence that Nicholas had a cervical dysfunction and no indication that he had a decreased range of motion, loss of strength or any numbness in his left arm that would have precluded him from performing his duties as a designer.  MetLife obtained an independent review of Nicholas' file by a physician board certified in neurosurgery.  The consultant concluded that there was no evident impairment based on the lack of objective findings in the medical information.  "No specific limitations would be expected other than heavy lifting in excess of 50 pounds due to your lumbar surgery."

In its letter, MetLife noted that the Plain required an eligible employee's doctor to provide evidence of the disability.  That evidence must support the employee's inability to perform the essential functions of his own occupation.  In this case, MetLife concluded that objective medical

documentation of a disability was not provided for the period of December 19, 2002 through January 23, 2003.

After receipt of the denial letter, Nicholas retained counsel who requested that MetLife send all pertinent documents and information in Nicholas' file.  On November 21, 2003, Nicholas' attorney wrote to MetLife asking to reopen the analysis of Nicholas' claim, notwithstanding information provided to Nicholas in the April 2003 rejection letter that no further appeals were permitted.  In support of Nicholas' request, his attorney submitted a letter the attorney requested from Dr. Erasmus. Dr. Erasmus' letter, dated September 16, 2003, states that Nicholas' back surgery (in November 2002) was helpful to him and that his post-op recovery was "approximately normal."  However, Dr. Erasmus stated that Nicholas:

> was disabled from doing his work as a draftsman for six weeks after the date of the surgery . . . because that work required that he sit in one place for extended periods of time.  It was my recommendation that he avoid that activity for at least six weeks following the surgery to avoid placing undo stress on the surgical site.  Because of the surgery, Mr. Nicholas was not able to perform the essential functions of his occupation, that of a draftsman.  Objective evidence of Mr. Nicholas' inability to perform that job during that period of time has been supplied to you in the medical records previously submitted.

[MCL 42.]  According to MetLife's diary entries, Nicholas' attorney was informed that Honeywell's Plan had only one level of appeal that was already exhausted.  This lawsuit ensued.

**C.   Discussion**

In its motion, MetLife asks the Court to affirm the denial of benefits and dismiss the complaint.  In his cross-motion, Nicholas asks the Court to award benefits because he argues both that the denial decision was unreasonable, arbitrary and capricious and because MetLife failed to render a decision on review.

*1.      Extension of Time to Decide Appeal*

Section 7.4(b)(2) of the Plain provides in pertinent part:

> The claimant shall be advised that he . . . may request a review by the
> Claims Administrator of the decision denying the claim by filing a
> written request for such review with the claims Administrator within
> 60 days after such notice has been received by the claimant. . . .If the
> claimant . . . makes a timely request for review, a decision on review
> shall be made by the Claims Administrator within a reasonable period
> of time after the Plan's receipt of such request for review (not to
> exceed 45 days after receipt of the request for review).  The Claims
> Administrator shall have the authority to request one extension (of up
> to 45 additional days) of the initial 45-day period, provided the
> extension is required by special circumstances and written notice of
> the extension is furnished to the claimant prior to the end of the initial
> 45-day period.

The applicable federal regulations state in pertinent part that:

> [T]he plan administrator shall notify a claimant . . . of the plan's
> benefit determination on review within a reasonable period of time,
> but not later than 60 days after receipt of the claimant's request for
> review by the plan, unless the plan administrator determines that
> special circumstances (such as the need to hold a hearing, if the plan's
> procedures provide for a hearing) require an extension of time for
> processing the claim.  If the plan administrator determines that an
> extension of time for processing is required, written notice of the
> extension shall be furnished to the claimant prior to the termination of
> the initial 60-day period. . . . The extension notice shall indicate the
> special circumstances requiring an extension of time and the date by
> which the plan expects to render the determination on review.

29 C.F.R. 2560.503-1(h)(4)(i).  Thus, the federal regulations actually allow more time for the review

and possible extension.

Here, Nicholas states that March 17, 2003 was exactly 45 days from the date MetLife

received his request for review.  Because the notice was mailed to him, Nicholas argues that the

notice did not meet the Plan or CFR requirement, i.e., that he actually have in his hands the notice

of extension before the 45-day period expired.  MetLife argues that Nicholas is incorrect.  The

administrative record shows that on February 3, 2003, Nicholas faxed his request for review from Albuquerque after 5 p.m. to MetLife at a Lexington, Ky fax number.  MetLife would not have received the request until February 4, 2003.  March 17, 2003, the date of the notice of extension, was 41 days after February 4, 2003.  The record evidence demonstrates there is no genuine issue of material fact regarding the timeliness of the notice.

In addition, Nicholas asserts that the notice did not inform him of any "special circumstances" to justify an extension, in violation of the CFR provision. The notice states simply that MetLife was continuing its review and needed an additional 45 days to render a decision on the appeal.  Since Nicholas did not receive notice of the special circumstances warranting the extension, he argues the extension was not allowable and that essentially, no decision was rendered within the permissible time limit.  By forfeiting its ability to deny Nicholas' appeal, Nicholas claims the appeal should have been granted by default.  In addition, he asserts that by violating the requirements of ERISA in this manner, MetLife is not entitled to any deference (and again that the *de novo* standard of review should be applied).

First, even if the Court were to determine that MetLife missed the 45-day deadline by a day or two, this type of minor procedural defect, under the circumstances of this case, would not warrant either the application of the *de novo* standard of review or the reversal of MetLife's denial decisions. *See* Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 634 (10th Cir. 2003) (noting argument was not entirely without merit that depriving the administrator of his discretion for a minor procedural irregularity that did not substantively harm the claimant would reflect a hyper-proceduralism that is

inconsistent with the flexibility and discretion contemplated by the Plan and ERISA regulations);[9] Sage v. Automation, Inc. Pension Plan and Trust, 845 F.2d 885, 895 (10th Cir. 1988) (not every procedural defect upsets the decision of the plan administrator). *See also* Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 144 (1985) (administrator's delay is not necessarily a substantive violation giving rise to a private cause of action).

Similarly, the fact that MetLife did not set forth an explanation of the special circumstances in its notice of extension is also nothing more than a minor technical violation. The Plan itself does not require the explanation. The federal regulations do. However, this is not a case where MetLife sat back and did nothing, failed to respond to Nicholas many telephone inquiries, and left Nicholas in the dark about his request for review. This is made clear by MetLife's numerous diary entries. For example, the February 10, 2003 entry reads that Nicholas called about a decision on the "med" received. On the same date, MetLife left him a voice message that the medical received would be sent to the appeal unit for review. The next day, February 11, the diary shows that the appeal was received on February 4, 2003. On February 14, 2003, Nicholas called again and the call was returned. He was told that his appeal was under review. He wanted a check issued right away, assuming his appeal would be approved.

---

[9]In Gilbertson, the Tenth Circuit reversed the district court's grant of summary judgment to defendants and remanded for a *de novo* review of her eligibility for long term disability benefits. 328 F.3d at 636-37. However, in that case, the Claims Administrator accepted the applicant's request for review, granted the claimant an extension to submit medical record and then never communicated again to the claimant. Her attorney sent the Administrator several letters asking whether the Administrator would accept or reject the claim but received no answer. Id. The Tenth Circuit agreed that a "substantial compliance" approach was the correct approach in that case, but also noted that "not every decision that comes [a day after the deadline] following the claimant's notice of appeal must be subject to plenary review in federal court." Id. at 636. These circumstances are far different than what occurred in Nicholas' case, because he was provided with detailed decisions, both with respect to the initial request and the request for review. The Court concludes that MetLife was in substantial compliance.

On February 18, MetLife again returned Nicholas' call.  On that same date, the entry shows that there was a letter from Nicholas with the January 23 medical note.  The diary also states that Nicholas returned to work on January 27 and that no medical evidence was provided as to why he could not return to work prior to that date.  On February 21, Nicholas inquired to see that MetLife had the correct return to work date and to ask whether any other information was needed.  MetLife returned his call.  On March 11, MetLife again advised Nicholas that his appeal was in review.  In April, MetLife sought and obtained Nicholas' written job description.  [MCL 35-37.]

Based on this type of record, including the extensive dialogue between MetLife and Nicholas, the Court concludes that MetLife was in substantial compliance with the Plan and ERISA.  The Court's conclusion is particularly justified here where MetLife provided detailed explanations to Nicholas for its original denial of benefits and also for its denial of his request for review.  *See* Gilbertson, 328 F.3d at 634 (courts willing to overlook administrator's failure to meet certain procedural requirements when administrator substantially complied with the regulations and  when process as a whole fulfills broader purposes of ERISA and its accompanying guidelines) (internal citation omitted).  Therefore, the Court recommends rejection of Nicholas' arguments based on alleged procedural irregularities.

### 2.    *Arbitrary and Capricious*

MetLife's initial denial of Nicholas' claim beyond December 19, 2002, clearly set forth the reasons for its decision.  Based on the medical evidence it had, MetLife noted that (post-operatively) in December 2002, Nicholas was ambulating independently, had a steady gait and did not need to use narcotic pain medications.  Nicholas complained only of intermittent left leg pain.  The doctor had instructed him he could resume swimming.  Later in December, Dr. Erasmus advised Nicholas to

19

increase physical activity but with no heavy lifting or bending.  Nothing in these medical records indicated that Nicholas was unable to sit for any length of time.  Because MetLife observed that Nicholas' position was a sedentary position, that did not require heavy lifting or bending, Nicholas did not meet the Plan's definition of "total disability."

This initial denial of benefits (beyond December 19, 2002) was not arbitrary and capricious and instead, was well supported by the medical evidence in MetLife's possession.  In applying the appropriate level of deference to the administrator's decision, the Court further finds that MetLife's reasoning was not only logical, it probably was the "best conclusion" based on the objective medical evidence before it.

With regard to MetLife's April 29, 2003 denial of Nicholas' request for review, the administrator again set out detailed reasons for its decision.  [MCL 50.]  This time, MetLife provided even more details in its denial letter and also discussed the additional January 23, 2003 medical record from Dr. Erasmus.  MetLife noted that the January 23 record indicated Nicholas was doing very well and had started yoga.  The primary problem documented in the record appears to have been linked with Nicholas' left arm.  Dr. Erasmus advised Nicholas that if the problems persisted he might need to have an MRI done.  The note then states that Nicholas would be out of work at least six weeks as his position required him to sit "in one place with his neck fixed for a long period of time."  Dr. Erasmus then opined that he would not expect, after the surgery, that Nicholas could return to that type of activity for at least six weeks because it would include sitting for an extended period of time.

It appears from MetLife's denial letter, that it read Dr. Erasmus' January 23 record to be discussing the possibility of a cervical or arm problem.  MetLife observed that there was no medical evidence reflecting a cervical impairment.  MetLife further stated that there was no indication that

Nicholas had a decreased range of motion, loss of strength or numbness in his left arm that would prevent him for performing his job duties.  MetLife then had an independent consultant review Nicholas' file and the consultant also stated that there was no medical evidence to demonstrate Nicholas was unable to perform his work.  [MCL 52.]

Perhaps MetLife's reasoning, at worst, would not be the "best" interpretation of Dr. Erasmus' January 23 note.  Yet, it certainly is a reasonable interpretation based on the notations Dr. Erasmus made and the absence of any documented subjective complaints by Nicholas about anything except his arm.  In addition, considering that Nicholas returned to work January 27, 2003, four days after the doctor's appointment, MetLife's conclusion is logical, and is supported by the medical evidence in Nicholas' claim file.

Therefore, the Court concludes that MetLife's denial of the request for review was not arbitrary and capricious and recommends that MetLife's determinations be upheld as to the denial of STD benefits from December 19, 2002 through January 23, 2003.

II.   **NICHOLAS' MOTION FOR STATUTORY DAMAGES**

On March 1, 2005, Nicholas filed a motion for statutory damages, seeking an award of $39,710.00 for MetLife's failure to supply a copy of the Plan to Nicholas when his attorney  wrote to MetLife in May 2003 requesting all pertinent documentation.  [Doc. No. 43, Ex. A.]  There are a number of problems with Nicholas' motion, each of which is fatal.

First, the motion is untimely because it was filed outside the motion filing deadlines and extensions provided by the Court.  The general motion filing deadline in this case was January 12, 2005.  [Doc. No. 26.]  The Court gave Nicholas the benefit of the doubt by extending the deadline by which to file cross motions for summary judgment until February 18, 2005.  [Doc. No. 38.]

21

Nicholas filed his cross motion.  However, this motion for statutory damages is untimely, having been filed late by at least 1½ months.  Prior to filing this motion, Nicholas neither sought nor obtained permission from the Court to file an "out-of-time" motion.  Thus, Nicholas' motion is untimely.  On that basis alone, the Court need not address the merits of Nicholas' argument.

Second, the motion essentially asserts a new cause of action that was not set out in the amended complaint, even though the Court permitted Nicholas to file an amended complaint so that he could assert his ERISA claims.  Neither the amended complaint nor Nicholas' portion of the Initial Pre-Trial Report set forth a cause of action seeking civil penalties under 29 U.S.C. § 1132(c).  *See* Maez v. Mountain States Tel. & Tel., Inc., 54 F.3d 1488, 1507 (10th Cir. 1995) (complaint set out a claim for imposition of civil penalties against the administrator).  Thus, this motion seeks relief beyond the scope of the allegations pled in Nicholas' amended complaint.  Indeed, it appears that this new claim is more like an after thought.  In any event, this type of request for statutory damages is not properly the subject of a motion, and it is outside the scope of this lawsuit.

However, even if the Court were to examine the motion or request on the merits, the Court would recommend it be denied.  Title 29 U.S.C. § 1132(c) provides that any administrator who fails to comply with a request for any information which such administrator is required to furnish to a participant or beneficiary "may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper."

It is true that Nicholas' attorney asked MetLife for all pertinent documents, "whether or not these were utilized in evaluating Mr. Nicholas' claim." [Doc. No. 43, Ex. A.]  Nicholas' attorney did not expressly identify the Plan in this letter, but it is clear that the Plan would have been used in

evaluating Nicholas' claim.  Nicholas argues that the Plan was central to any complaint he could bring and the failure to supply the plan was "most grievous."

MetLife supplied the Plan as an attachment to its removal pleadings.  So, clearly, Nicholas had the Plan when he amended his complaint.  Interestingly, Nicholas does not directly assert that he did not already have the Plan or that he had unsuccessfully attempted to obtain a copy of the Plan, or that he has been prejudiced in any way.  In any event, the Court determines that Nicholas was not hindered in filing his ERISA claims in this matter because by the time he filed his amended complaint, he had the Plan.  Moreover, because the imposition of civil penalties is committed to the discretion of the Court, in the sound exercise of its discretion, the Court recommends that the request be denied.[10]

### Recommended Disposition

For the reasons stated above, the Court recommends that Defendant MetLife Disability's Motion for Judgment on the ERISA Record [Doc. No. 35] be GRANTED, that Plaintiff's cross motion for summary judgment [Doc. No. 41] be DENIED, that Plaintiff's Motion for Statutory Damages [Doc. No. 43] be DENIED, and that the case be DISMISSED, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge

---

[10]Even if Nicholas had properly set forth the claim for statutory damages in his amended complaint, the Court does not decide the question of whether he could state a claim for statutory damages against the Claims Administrator.  *See* Walter v. International Ass'n of Machinists Pension Fund, 949 F.2d 310, 315 (10th Cir. 1991) (observing that 29 U.S.C. 1132 addresses *plan* administrators' duties).